Filed 7/6/23  P. v. Mancilla CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JAIRO MANCILLA,<br><br>Defendant and Appellant. | F082925<br><br>(Super. Ct. No. F17902461)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Houry A. Sanderson, Judge.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen, Ivan P. Marrs, and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

SEE CONCURRING OPINION

# INTRODUCTION

Defendant Jairo Mancilla was convicted of the first degree murders (Pen. Code,[1] § 187, subd. (a)) of Javier Lizaola, Jr. (count 1) and James Alexander Esquibel (count 2). As to each count, the jury found true a multiple-murder special circumstance (§ 190.2, subd. (a)(3)), an enhancement for the personal discharge of a firearm causing death (§ 12022.53, subd. (d)), and a gang enhancement (§ 186.22, subd. (b)(1)). On each count, the court sentenced defendant to a term of 25 years to life (see § 12022.53, subd. (d)), plus a consecutive term of life without the possibility of parole. The court stayed the gang enhancements under section 186.22, subdivision (b)(5) pursuant to California Rules of Court, rule 4.447.

On appeal, defendant contends (1) the trial court prejudicially erred by failing to instruct the jury on imperfect self-defense; (2) the gang enhancements must be reversed based on changes to the law made by Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill No. 333); (3) the evidence was insufficient to support the jury's findings that the shootings were gang related under the version of section 186.22 in effect at the time of trial, as clarified by *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*); (4) he is entitled to a new trial on the substantive offenses separate from trial of the gang allegations pursuant to section 1109; and (5) the trial court erred by imposing a parole revocation fine.

We accept the People's concession that the gang enhancements must be reversed pursuant to *Renteria*, *supra*, 13 Cal.5th 951. Accordingly, we remand for resentencing. We otherwise affirm the judgment.

---

[1] Undesignated statutory references are to the Penal Code.

## FACTS

### I.     The Shooting

After school on the afternoon of March 10, 2017, 17-year-old G.V.[2] was outside his house in Orange Cove, playing cards with his friend, 16-year-old R.M.  After an hour or two, Anthony C., who G.V. knew as "Guero," stopped by.[3]  G.V. and R.M. had known each other for six or seven years.  G.V. had known Anthony for about two years.  R.M. had never met Anthony before.  The three remained at G.V.'s house for about 35 or 40 minutes.

Eventually, Anthony suggested they take a walk to a nearby bike trail to "blaze it," meaning to smoke the marijuana he brought.  It was just starting to get dark.  The trio crossed a bridge and smoked as they walked on the bike trail.  They first went to the right, but saw a woman and some children and turned around to avoid smoking in front of them.  G.V. took two or three "hits" of marijuana but only felt the effects "[a] little." R.M. took one or two hits off the joint and did not feel the effects.

The trio stopped at a bench on the bicycle trail and sat for a while.  At some point, they saw defendant approaching on the bike trail.  Anthony walked over to defendant and spoke to him.  It appeared to R.M. that Anthony and defendant knew each other.  G.V. and R.M. had never met defendant before.  Anthony returned to the bench with defendant and defendant shook hands with G.V. and R.M.  Defendant was wearing white earphones and was talking on the phone.  At some point, defendant asked R.M. where he was from, and R.M. said he lived in Dinuba.

Defendant was wearing black shorts, a black, short-sleeved shirt with white lettering, Nike shoes, and a straw hat like the type used for field work.  G.V. testified the

---

[2] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names or initials.  No disrespect is intended.

[3] G.V. testified that "Guero" means "[w]hite."

straw hat covered the top of defendant's face down to his nose. R.M. testified the hat came down to the middle of defendant's forehead. R.M. noticed defendant had a tattoo of a five-digit number above his left eyebrow that appeared to be a zip code beginning with the number nine. R.M. believed this to be the Orange Cove zip code. G.V. noticed that defendant had tattoos on his legs, including one that appeared to be a large "V" and another that appeared to be large vertical lines like another large letter. At trial, G.V. recognized a picture of defendant's legs, which had tattoos of the letters "V" and "L." Defendant also had tattoos on his arms but G.V. did not know what they were.

The four young men congregated around the bench and talked for approximately 30 minutes to an hour as it got darker. They did not smoke any more marijuana. Some light posts in the area were working, and some were not. Parts of the area near the bench were illuminated.

At some point, a woman rode by on a bicycle with a small trailer attached. She had one or two children with her, one of whom was riding a bike alongside her. Defendant yelled out to the woman, greeted her with a hug, and called her sister. She stopped to talk with defendant for about a minute. Defendant asked what she was doing out there and she responded that she was going to buy something. Defendant gave her a hug and told her to be careful. The woman and kids rode away.

At some point, Anthony said his brother was going to drop off food or money to buy food. Eventually, a car approached and Anthony spoke to the occupant for a minute or two.

When the vehicle left, the four men again gathered around the bench. G.V. testified that he was not high, and the effects of the marijuana were starting to go away. G.V. was sitting on the left side of the bench, and defendant was sitting on the right, while R.M. and Anthony were standing.

Two men appeared on the bike trail coming from the direction of a nearby liquor store. One of them was carrying a black bag. G.V. noticed the men when they were

4.

about 500 feet away and watched them approach. Defendant looked toward the men when they were about 300 feet away. When the two men were about 50 feet away, defendant leaned back and put his right hand near his waist. The two individuals passed in front of G.V.'s group. The two men were "going to pass by" and did not say anything. They made upward movements with their heads, as if to greet defendant and the group. G.V. did not perceive the movement as aggressive.

Defendant said to the two men, "What's up ese[?]" G.V. testified this phrase did not seem aggressive to him. However, he thought "ese" might have a different meaning "for them than for us." R.M. said he did not know whether it was aggressive and that defendant "just said what's up." The two men turned and walked toward defendant.

According to G.V., one of the two passersby said, "Shut up ho," and grabbed at something in his pants. G.V. said the person pretended like he was going to hit defendant but did not.

According to R.M., one of the two passersby said, "[W]hat bitch," or "[W]hat's up bitch," walked toward defendant, and pretended like he was going to hit defendant but did not. The other passerby said, "What's up dog[?]"

Defendant pulled something from his waistband, extended his arm in front of himself, and fired two shots at the men in quick succession.[4] The two individuals fell to the ground, and G.V. could see one of them bleeding. One of the victims, Javier Lizaola, Jr., died at the scene from a gunshot wound to the head. The other victim, James Alexander Esquibel, died at the scene from a gunshot wound to the chest.

Immediately after the shooting, G.V. ran home, and R.M. followed after him. R.M. looked back and saw defendant running. Defendant glanced at R.M. and G.V. as he

---

[4] R.M. testified he told officers defendant had pulled out a gun, but at trial, he claimed he did not actually see a firearm. G.V. saw flames in front of defendant as he fired.

ran by. It bothered R.M. that defendant was nearby because "he could have shot [them], too."

G.V. and his father discussed the incident. R.M. was scared to call the police because he did not want problems for being a snitch.

After the shooting, Anthony sent a text message to G.V. telling him not to say anything. Several days later, Anthony sent a text message to G.V., inviting him to go smoke marijuana. G.V. did not want to go because Anthony might want to make him "disappear." G.V. moved out of Orange Cove three or four days after the shooting.

At trial, both G.V. and R.M. identified defendant as the shooter. However, G.V. acknowledged that, at the preliminary hearing, he identified defendant as the shooter based on having seen his photograph on Facebook and not based on any independent memory of defendant having committed the shooting. On redirect, G.V. explained that, when he saw defendant at trial, he "had a memory of the day that it happened and of the pictures that [he] saw."

## II. The Investigation

Law enforcement was dispatched to the scene of the shooting at approximately 8:07 p.m. that night. They found the victims lying on the ground dead near the bench. There were two white plastic bags near the victims, one containing a three-pack of beer and the other containing a three-pack of beer with one of the cans missing. There was also an open and empty beer can underneath one of the victim's legs. The light post near the bench and the victims was not working. No shell casings were found at the scene. No fingerprints were recovered at the crime scene.

Two bicycles were found within the crime scene area. One of the bicycles was connected to a child trailer and was found just off the bike path, north of the bench where the shooting occurred. Inside the trailer was an EBT card with the name of Valeria Mancilla. Officers determined Valeria Mancilla is defendant's sister. A woman who

identified herself as Valerie Fernandez contacted officers sometime after the shooting about a bicycle that was within the crime scene area.

On the night of the shooting, at about 10:04 p.m., Fresno County Sheriff's Deputy V. Alonzo was on patrol in Squaw Valley when he saw a vehicle stopped on the side of the road with someone crouched near the right rear passenger side. Alonzo pulled over and approached the individual, who he identified at trial as defendant. Defendant seemed nervous and spoke with a stutter. Alonzo searched the vehicle and found bolt cutters, a flashlight, gloves, and a tactical vest. He found nothing to justify an arrest of defendant. He observed the right rear passenger tire to be flat and offered to help defendant fix it, but defendant refused. Alonzo left without arresting defendant.

A criminalist with the Fresno County Sheriff's Office analyzed the bullets recovered in Lizaola's and Esquibel's autopsies and opined that they were fired from the same gun.

Defendant was arrested on April 21, 2017, and was photographed at that time. Above his left eyebrow was a tattoo of "93646," the Orange Cove zip code. He had tattoos of the letter "F" on the back of his left forearm, the letter "C" on his right forearm, the letter "B" on his right upper forearm near the elbow, the letter "P" on the left upper forearm near the elbow, the letter "V" on his right shin, and the letter "L" on his left shin. Appellant also had a tattoo of Marilyn Monroe covering most of the left side and top of his head.

## III.    Interviews of G.V. and R.M.

On March 21, 2017, Fresno County Sheriff's Detectives J. Diaz and A. Maldonado interviewed G.V. as a potential witness. G.V. told Diaz that, on the day of the shooting, he, R.M., and "Guero" played cards and listened to music at his house. G.V. did not know Guero's real name. Diaz was later able to identify Guero as Anthony C.

G.V. reported to Diaz that, on the bike trail, the suspect called out to a woman riding a bicycle something to the effect of, "Hey, sister," and "It[']s me" (boldface

omitted). The woman's bicycle had something like a trailer in the back and she was with a child who also was riding a bicycle. Regarding the confrontation preceding the shooting, G.V. reported that the suspect said, "What's up ese[?]" The younger of the two victims responded, "Shut up ho" (boldface omitted), and then pretended he was going to hit the suspect. The second individual said, "What's up dog[?]" (Boldface omitted.)

G.V. reported to Diaz that Anthony contacted him right after the shooting and told him not to say anything. Diaz could not recall whether G.V. said he spoke with Anthony or whether this was relayed by text message. G.V. reported that, on the Wednesday after the shooting, he received a call from Anthony asking him if he wanted to "blaze it." (Boldface omitted.)

G.V. mentioned to Diaz that he had seen reference to the victims on Facebook, and he referenced them by their monikers, JJ and Big Navajo. He was unable to provide information that would enable the detectives to develop a suspect in the shooting.

Diaz and Maldonado interviewed R.M. on March 22, 2017. R.M. spoke quietly and sometimes had difficulty understanding the questions posed to him. Diaz showed R.M. a photograph of Anthony, and R.M. reported that he did not really know the person but thought his name was Tony. He thought that Tony was a Sureño gang member or mostly hung around with Sureños.

R.M. provided Diaz with information regarding the evening of the shooting that was similar to his trial testimony. Additionally, he reported to Diaz that Tony told him that the woman on the bicycle was the suspect's sister, and that the suspect also said, "There's my sister," and screamed out her name. (Boldface omitted.) However, R.M. could not recall the woman's name. He described the woman's bicycle as a long bike that had a trailer for kids. The woman was with one or two little kids.

Regarding the confrontation that preceded the shooting, R.M. said the suspect said to the victims, "What's up ese[?]" (Boldface omitted.) R.M. said one of the victims walked up pretending he was going to hit the suspect by making a jerking motion while

8.

leaning forward.  The other victim said either "[W]hat's up dog" or "[W]hat's up Bulldog" to the suspect.  (Boldface omitted.)  R.M. saw the suspect reach across his abdomen with his right hand and begin to stand up.  He pulled out a gun and shot each victim one time.  R.M. specifically reported seeing the gun.

Diaz showed R.M. two photographs taken from law enforcement databases, and R.M. was able to identify the individuals portrayed in the photographs as the shooting victims.  R.M. also provided a description of the shooter.  R.M. told Diaz that the shooter was male, medium height with skinny build, with a mustache and facial hair on his chin.  He stated the shooter had a tattoo of numbers above his left eyebrow, the first of which was nine, and that it was possibly the zip code for Orange Cove.

Diaz ran a search of Fresno County law enforcement contacts for individuals with a tattoo of the zip code for Orange Cove.  The search returned a photograph of defendant.  No one else matched the search criteria.  Diaz showed R.M. a lineup of six photographs, and R.M. identified defendant as the shooter within about 30 seconds.

## IV.    Gang Evidence

The following evidence was presented regarding defendant's membership in the Vatos Locos Sureños (VLS) subset of the Sureño criminal street gang.

### A.    Defendant's Prior Law Enforcement Contacts

On June 5, 2009, at about 12:26 p.m., a sheriff's deputy contacted defendant in a consensual encounter near 11th Street and Railroad Avenue in Orange Cove.  When asked if he was a gang member, defendant said he was "VLS."  The deputy saw "OC" tattooed on defendant's right hand, and "[B]" and "P" on the backs of his triceps.[5]  When

---

[5] The reporter's transcript says "V" and "P," but the deputy then testified that it stood for "Brown Pride."  Also, the prosecutor's immediate follow up question was what meaning "the B and the P" had.  (Boldface omitted.)  Therefore, it seems clear this was a transcription error, and that the deputy testified the tattoos were "B" and "P."

asked what the "B" and "P" tattoos meant, the deputy testified, "Brown Pride which is Sure[ñ]o." The deputy further testified that "OC just depicts the area that you're in."

On January 7, 2010, an Orange Cove police officer served defendant with a gang injunction.

On March 16, 2012, at around 5:13 p.m., an Orange Cove police officer contacted defendant near Adams Avenue and 12th Street. The officer observed a new, though unfinished, tattoo of the number 13 on defendant's right inner forearm. Defendant admitted he was a Sureño gang member.

On July 15, 2012, at around 10:21 p.m., an Orange Cove police officer contacted defendant at the intersection of Anchor and Adams Avenues. Defendant was wearing a blue shirt, white shorts, and blue tennis shoes. Defendant admitted he was a Sureño gang member. When asked how long he had been a Sureño, defendant said, "For a while."

On February 28, 2013, at around 3:40 p.m., the same Orange Cove police officer contacted defendant and Brian Santos in front of a residence on the 600 block of Anchor Avenue. Defendant was wearing blue jeans and a blue and white striped polo shirt. Defendant admitted he was a Sureño gang member. Defendant also said he knew Santos was a VLS Sureño gang member.

On April 13, 2013, at about 8:12 a.m., the same Orange Cove police officer observed three males – defendant, Abran Zavala and Brian Santos – inside a parked van at the same residence on the 600 block of Anchor Avenue. During the officer's prior contacts, there were "gang relations associated with" all three of the individuals and the VLS gang. Zavala and Santos admitted gang membership.

On August 19, 2013, a Fresno County Sherriff's deputy contacted defendant in the breezeway of the main courthouse. Defendant admitted he was a Sureño and lived in Orange Cove. He stated he had been a Sureño most of his life. He also said most of his friends and some family were Sureños.

On January 28, 2015, at around 4:56 p.m., an Orange Cove police officer was dispatched to a location in Orange Cove for a disturbance call involving four individuals fighting. Upon arriving at the location, the officer did not see anyone, but contacted an individual about two blocks away. That individual confirmed to officers that he was an active Bulldog gang member. The individual informed the officer that the people he had argued with were in a red truck, which was driving through the area. Officers conducted a traffic stop. The driver was Peter Gonzalez, and the passenger was defendant. The officer searched a law enforcement system and learned that defendant and Gonzalez had previously been served with a gang injunction that prohibited them from associating with known gang members within the city limits of Orange Cove. The officer asked defendant if he knew he was under the injunction, and he replied along the lines of, "Yes, I guess." Defendant and Gonzalez were cited for violating the injunction.

B. **Predicate Offenses**

On May 17, 2012, at about 2:26 p.m., an Orange Cove police officer was dispatched to a burglary in progress. When he arrived at the address, he observed Adrian Cavazos in the dining room of the residence. A chase ensued, and Adrian[6] was eventually placed into custody. The officer observed that items were "thrown around" in the residence and a television had been removed from its wall mount or stand. Adrian was convicted of first degree residential burglary. Adrian is a self-admitted VLS Sureño gang member.

On May 14, 2013, at about 3:37 p.m., an Orange Cove police officer was dispatched to the intersection of Ninth Street and Park Boulevard for a report of shots fired. The officer found a gunshot victim at a school approximately five blocks away. The gunshot victim reported that he was driving when another vehicle pulled up beside

---

[6] To avoid confusion with Joseph Cavazos, discussed below, we refer to these individuals by their first names.

11.

him, and the driver of that vehicle fired shots at him. The gunshot victim reported that the shooter, Alejandro Moreno, had shot at him in previous incidents. Moreno pled to and was sentenced for violating section 245, subdivision (a)(2). Moreno was an active VLS Sureño gang member.

On October 26, 2013, at about 10:24 p.m., a California Highway Patrol officer conducted a traffic stop in Orange Cove on a vehicle being driven by Joseph Cavazos. The officer found a loaded handgun in the center console of the vehicle. Joseph was arrested for possessing the firearm and was prosecuted for violating section 29800. Joseph said he was an Orange Cove Sureño gang member.

On June 16, 2014, at about 1:49 p.m., an Orange Cove police officer pursued a vehicle after it fled during a traffic stop initiated by other law enforcement personnel. The subject vehicle rammed the officer's vehicle twice. The driver of the vehicle was Juan Alberto Diaz. Diaz pled to and was sentenced for violating section 245, subdivision (c) and Vehicle Code section 2800.2. Diaz is a VLS gang member.

C.     **Prosecution's Gang Expert**

Detective R. Swiney with the Fresno County Sheriff's Office testified as a gang expert for the prosecution. His primary area of expertise was Sureño and Bulldog criminal street gangs operating outside the City of Fresno. Swiney explained that the two gangs are rivals.

Swiney explained that a person can become a Sureño gang member by being "jumped in," that is, beaten for a certain amount of time, being "blessed in," that is, being allowed to join because of familial contacts, and by "putting in work," that is, committing crimes for the benefit of the gang. Those who hang around a gang member but are not members themselves may be known as associates.

Swiney explained that the Sureño gang has a hierarchical structure with members who are "in charge" being referred to as "shot callers." Some members are put in charge of gathering money (i.e., "taxes") on behalf of the gang. The gang makes money by

12.

committing burglaries and robberies, obtaining stolen property, and selling narcotics. Taxes are paid to the Mexican Mafia prison gang for protection of incarcerated Sureños.

Members of the Sureño gang care about the reputation of their gang. Committing violent crimes, such as murder, attempted murder, and assault with deadly weapons, instills fear and intimidates rival gang members and citizens in the community. As a result, witnesses to gang crimes often do not cooperate with law enforcement, which allows the gang to continue committing crimes. Fear and respect also help promote the gang and protect the gang's territory.

Gang members will intentionally disrespect members of rival gangs by using derogatory terms or committing crimes in their rivals' territory. They may also cross out their rival's gang graffiti and put down who it came from. "[H]itting someone up" (boldface omitted) means to ask someone what gang they are from, and can be seen as a sign of disrespect that would lead to a violent confrontation. A gang member disrespected by a rival could respond with anything from "a simple stare down" to an assault or even a murder.

VLS is a subset of the Sureño criminal street gang that claims the city of Orange Cove as its territory. In March 2017, VLS had between 50 and 70 members. VLS members will sometimes identify themselves as Orange Cove Sureños or Orange Cove Sur. Members identify with the color blue and often wear apparel of the Dallas Cowboys or Los Angeles Dodgers. Common tattoos for members include "VLS," "Orange Cove Sure[ñ]os," "Orange Cove Sur," the number 13, one dot and three dots, "Orange Cove" or "O" and "C," a zip code or area code from Orange Cove, and the letter "M." Members make hand signs denoting the numbers one and three, the letters O and C, and the letters V and L.

Swiney opined that VLS engaged in a pattern of criminal gang activity, with the gang's primary activities being murder, attempted murder, assaults with deadly weapons, shooting at inhabited dwellings or vehicles, robbery, burglary, possession of firearms and

13.

possession of controlled substances for sale. VLS gang members are "territorial." (Boldface omitted.) They will mark their territory with gang graffiti and defend it with violent crime including murder.

Varrio Orange Cove Rifa (VOCR)[7] is subset of the Bulldog gang that also claims the city of Orange Cove as its territory. Bulldogs associate with the color red. VOCR members may have tattoos of dog paws, a picture of a Bulldog face, a dog collar, or other similar items. In March 2017, the Bulldog presence in Orange Cove was stronger than the Sureño presence. The rivalry between VOCR and VLS has resulted in attempted murders and assaults with deadly weapons. VLS members have tried to eliminate VOCR members to get them out of the area and expand VLS's territory.

Swiney opined that defendant is an active member of the VLS gang, meeting at least six gang criteria. Swiney pointed to the fact that defendant self-admitted VLS membership on multiple occasions, has gang-related tattoos and clothing, has been identified as a gang member by a reliable source, and has associated with documented gang members. Swiney found defendant's tattoos of "93646" above his left eyebrow and Marilyn Monroe on his head to be significant in a gang context. Marilyn Monroe's initials are a reference to the Mexican Mafia. Defendant's "F" and "C" tattoos stand for Fresno County and his "V" and "L" tattoos stand for Vatos Locos. Defendant's tattoos of "B" and "P" stand for Brown Pride which can be a representation of Sureño and/or VLS.

Swiney opined, based on the victims' tattoos, that they were members of the VOCR subset of the Bulldogs.

---

**7** The reporter's transcript at times says "BOCR" and "Barrio Orange Cove Rifa," but Swiney also testified to some of the tattoos found on the victims (see *post*, at p. 18). One such tattoo was described as "a tattoo on the right hand near the knuckles of VOCR" on Esquibel. In response to the question, "And, again, what does VOCR stand for[?]" (boldface omitted), Swiney replied, "Varrio Orange Cove Rifa Bulldog criminal street gang." Therefore, it seems clear these are transcription errors.

14.

When given a hypothetical generally tracking the prosecution's evidence of the present crime, Swiney testified such a crime would have benefitted the gang by protecting the gang's reputation and respect. Such a crime would also instill fear and intimidate witnesses and victims, which reduces cooperation with law enforcement and prosecutions. All that makes it easier for the gang to commit crimes.

### D. Other Gang-related Testimony

R.M. testified that he thought Anthony was a possible Sureño gang member. He based this belief on Anthony's familiarity with defendant and his belief that Anthony had family members associated with the gang.

Detective Diaz testified, based on his experience, that the phrase "what's up ese" (boldface omitted) is an aggressive statement used when a Sureño gang member confronts a rival gang member, whether Norteño or Bulldog.

## V. Defense Case

Dr. P. English is a cognitive psychologist with a Ph.D. in psychology. He testified for the defense. English has published scholarly pieces on general perception and vision. When given a hypothetical involving four youths near a bench in a park-like area on an evening with a full moon and no cloud cover, English testified they might not accurately perceive events due to degraded lighting conditions and the presence of other people, which are distractions. Stress or trauma can also compromise a witness's perception.

English also opined that our memories are cobbled together from multiple sources, including other peoples' recollection. There is a potential for memory contamination if a witness conveys their account to law enforcement 11 or 12 days after the event because intervening discussion with others could impact memory.

English criticized a "hypothetical" (boldface omitted) photographic lineup in which only one individual had a unique tattoo above his left eyebrow.

# DISCUSSION

## I.      Failure to Instruct on Imperfect Self-defense

Defendant argues the trial court prejudicially erred in failing to instruct the jury on the lesser offense of voluntary manslaughter based on imperfect self-defense. The People contend the evidence did not support instructing the jury on imperfect self-defense but, regardless, any error was harmless. We conclude the evidence supported instructing the jury on imperfect self-defense, but the error in failing to give the instruction was harmless.

### A.      Procedural Background

During a hearing on jury instructions, the court asked defense counsel to confirm that defendant was not requesting jury instructions on any lesser included offenses. Defense counsel responded, "That is correct because I don't think the state of the evidence would allow me to make that request." The court stated that it believed the evidence supported a verdict on first or second degree murder but not manslaughter. The prosecutor agreed, stating that the case was "an identity case," and that there was no issue regarding heat of passion or imperfect self-defense.

The court then confirmed that neither party had requested any self-defense instructions. The following colloquy between the court and defense counsel followed:

> "THE COURT:  Is that a strategic decision on your part to not argue two different theories to the jurors?
>
> "[DEFENSE COUNSEL]:  Yes.  It is defense's argument also that it wasn't [defendant].  It was someone else.  So it would—tactically, it would make no sense to argue but on the other hand it was a self-defense aspect.
>
> "THE COURT:  And as the evidence stands there was a very slight suggestion that any type of self-defense may have been at issue.  The two witnesses that were present during the event in question made reference to that the two victims individually made some sort of a lunging or forward motion toward the person seated at the bench.  But certainly, we don't know how that person received that motion.  And other than the statements

16.

by the witnesses that those two individuals were shot soon after such movement was made, there is no further evidence that the shooter had any type of a concern for his safety or the safety of the others with him. So the Court would not be giving any self-defense instructions. And again, the defense's position is that they are not asking for such as well."

## B. Applicable Law

" 'A trial court must instruct the jury on a lesser included offense, whether or not the defendant so requests, whenever evidence that the defendant is guilty of only the lesser offense is substantial enough to merit consideration by the jury.' [Citation.] The obligation to give an instruction on lesser included offenses exists even when a defendant expressly objects to it." (*People v. Nieves* (2021) 11 Cal.5th 404, 463.)

Voluntary manslaughter arising from imperfect self-defense is a lesser included offense of murder. (See *People v. Steskal* (2021) 11 Cal.5th 332, 345.) " 'Imperfect self-defense, which reduces murder to voluntary manslaughter, arises when a defendant acts in the actual but unreasonable belief that he is in imminent danger of death or great bodily injury.' " [Citation.] 'To satisfy the imminence requirement, "[f]ear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." ' " (*Ibid*.)

On appeal, we look for whether there is substantial evidence in the record that would have supported the omitted instruction. (E.g., *People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1139.) We review the evidence in the light most favorable to the defendant. (*Ibid*.) Doubts about the sufficiency of the evidence to warrant the omitted instruction are resolved in favor of the defendant. (*People v. Cleaves* (1991) 229 Cal.App.3d 367, 372.)

17.

## C.    An Imperfect Self-defense Instruction was Warranted

Sufficient evidence of imperfect self-defense was presented to merit the court giving the applicable instructions. Specifically, the evidence supported the following inferences. VLS and VOCR are rival gangs that both claim the city of Orange Cove as their territory. The rivalry between VOCR and the Sureños has resulted in attempted murders and assaults with deadly weapons. Defendant, a VLS gang member, observed two individuals approaching. The two individuals were members of the VOCR Bulldog gang with tattoos that included a red dog paw, and "O" and a "C," and "VOCR" for Varrio Orange Cove Rifa Bulldog. From defendant's long history with the VLS gang, he would have known about his own gang's violent rivalry with the VOCR.

Defendant said, "What's up ese[?]" to the individuals. The two VOCR members responded with something to the effect of "Shut up ho," or "[W]hat's up bitch," and "What's up dog[?]" One of the two VOCR gang members walked toward defendant, and pretended like he was going to hit defendant but ultimately did not. One of the VOCR gang members made a threatening gesture moving his hand toward his waist like he was going to retrieve something from his pocket but did not ultimately produce a weapon. Defendant then shot the two VOCR gang members.

Given the context of gang rivalry, the verbal statements of the VOCR gang members and their physical movements, there was sufficient evidence to conclude defendant acted in the actual but unreasonable belief that he was in imminent danger of death or great bodily injury. Accordingly, there was sufficient evidence to submit the issue of imperfect self-defense to the jury.

The People point to defendant's use of the "derogatory" phrase "what's up ese" as evidence that he did not believe he was in imminent danger. But the evidence was in conflict on whether that phrase was derogatory or aggressive. While Detective Diaz testified that "[t]ypically" it is used by a Sureño confronting a rival gang member, G.V.

18.

said the phrase was not aggressive.[8]  Instruction is required on all lesser included offenses supported by the evidence *regardless* of the relative strength of the evidence on alternate offenses.  (*People v. Breverman* (1998) 19 Cal.4th 142, 160 (*Breverman*).)  The question is not which theory of the offense is *most* consistent with the evidence but rather whether the uninstructed theory was supported by evidence sufficient to merit consideration by the jury.  (See *People v. Anderson* (2006) 141 Cal.App.4th 430, 443 (*Anderson*).)  We determine only the "bare legal sufficiency" of the evidence, "not its weight."  (*Breverman*, at p. 177.)  Because there was evidence the phrase was not aggressive, it is immaterial that there was other, perhaps even stronger, evidence the phrase was aggressive.[9]

In making these observations, we do not deny the contrary evidence indicating that defendant may well have intended to murder the victims before their verbal interaction. (*People v. Vasquez* (2006) 136 Cal.App.4th 1176, 1179.)  Rather we "hold only that it was for the jury, not the judge, to infer what [defendant] believed" with respect to imperfect self-defense.  (*Ibid.*)  In other words, the fact that the People have formulated a coherent view of the evidence consistent with the offense for which the jury was instructed does not mean it was unnecessary to instruct the jury on lesser included offenses supported by other evidence or inferences.  (See *Breverman*, *supra*, 19 Cal.4th at p. 160; *Anderson*, *supra*, 141 Cal.App.4th at p. 443; see also *People v. Vasquez*, at p. 1179 & fn. 2.)

The People argue that the reactions of Esquibel and Lizaola were "legally justified responses" to defendant's "verbal challenge."  The People rely on *People v. Enraca*

---

**8** When asked if he thought it was aggressive, R.M. said, "I don't know.  He just said what's up."

**9** Moreover, accepting that the phrase was "aggressive" does not preclude imperfect self-defense.  One reasonable inference from the evidence is that defendant could have been fearful of imminent harm and was trying to intimidate the rival gang members as a means of self-defense.

(2012) 53 Cal.4th 735 for the proposition that imperfect self-defense cannot be invoked " ' " 'by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified.' " ' " (*Id*. at p. 761.)  However, on the present standard of review, it is not dispositive that the People's view of the evidence is plausible or even persuasive.  What matters is that there was substantial evidence supporting the *uninstructed* theory (i.e., that "[w]hat's up ese" is not aggressive).  (See *Breverman*, *supra*, 19 Cal.4th at p. 160; *Anderson*, *supra*, 141 Cal.App.4th at pp. 442–443.)  "A defendant's right to instructions does not turn on the court's assessment of credibility or the strength of the evidence."[10]  (*People v. Cleaves*, *supra*, 229 Cal.App.3d at p. 371.)

The People next observe that defendant did not testify nor introduce any "direct" evidence of his mental state to justify imperfect self-defense.  However, even a defendant's subjective mental state does not need to be proven or supported with direct evidence but instead may be shown by circumstantial evidence.  (*People v. Superior Court (Costa)* (2010) 183 Cal.App.4th 690, 697.)  Indeed, this is common given that direct evidence of mental state is rarely available.  (*People v. Beeman* (1984) 35 Cal.3d 547, 558.)  Here, the circumstantial evidence supported the inference defendant was in

---

**10** Even if the standard of review permitted us to resolve this factual issue regarding the phrase "[w]hat's up ese," we doubt it is sufficient to trigger the doctrine relied upon by the People.  Whatever else can be said of the phrase, it is neither a physical attack nor the commission of the felony.  Even if other forms of conduct could suffice, it seems incongruous to argue that, in context, the phrase "[w]hat's up ese" would have justified a *perfect* self-defense response from Esquibel and Lizaola but, in the same context, the phrases "what's up bitch" or "[s]hut up ho" along with arguably threatening gestures do not even justify the jury's *consideration* of an *imperfect* self-defense response by defendant.  (See *People v. Vasquez, supra*, 136 Cal.App.4th at p. 1179 [doctrine defeating imperfect self-defense applies where the defendant's conduct would legally justify a self-defensive response by the victim].)

20.

actual fear due to the situation described above (e.g., defendant was approached by rival gang members with tattoos who made aggressive statements and gestures).

The People also point to the fact that defendant's theory at trial was that someone else shot the victims, which is inconsistent with defendant acting in imperfect self-defense. But once there is sufficient evidence of a lesser included offense theory, a court must instruct on it even if " 'the alternate theory . . . is inconsistent with the defense elected by the defendant. . . .' " (*People v. Eilers* (1991) 231 Cal.App.3d 288, 294.)

We next consider prejudice.

### D.     The Error was Harmless

An erroneous failure to instruct on voluntary manslaughter can be harmless in light of the entire record. (See *Breverman*, *supra*, 19 Cal.4th at pp. 164–165; see also *People v. Gonzalez* (2018) 5 Cal.5th 186, 195–196, 201.) Reversal is not permitted "unless an examination of the entire record establishes a reasonable probability that the error affected the outcome."[11] (*Breverman*, at p. 165.)

"[T]he *Watson* test for harmless error 'focuses not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration. In making that evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and

---

[11] Defendant argues a stricter standard for prejudice applies, relying on *People v. Thomas* (2013) 218 Cal.App.4th 630, 644 and *People v. Dominguez* (2021) 66 Cal.App.5th 163, 183. However, *Thomas* distinguished *Breverman*'s usage of the *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*) standard on the grounds that *Thomas* involved a *requested* instruction while *Breverman* dealt with the sua sponte duty to instruct on lesser included offenses. (*Thomas*, at p. 644.) On this distinguishing factor, the present case falls under *Breverman* rather than *Thomas*.

In any event, *Dominguez* and *Thomas* are Court of Appeal opinions while *Breverman* and *Gonzalez* are Supreme Court opinions. This issue is currently pending review by the Supreme Court in *People v. Schuller* (2021) 72 Cal.App.5th 221, review granted, January 19, 2022, S272237. Unless and until the Supreme Court overrules *Breverman* and *Gonzalez*, we will follow their lead and apply *Watson*.

the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result.' " (*People v. Beltran* (2013) 56 Cal.4th 935, 956 (*Beltran*).)

While we determined above that the issue of imperfect self-defense should have been submitted to the jury, we also conclude below there is no reasonable probability defendant would have obtained a more favorable result if it had.

G.V. testified that as the two victims were approaching, defendant sat back and put his right hand near his waist (which is where he would later pull the weapon from).[12] Both victims were "going to pass by" and made nonaggressive, upward movements with their heads as a greeting. Defendant said, "What's up ese[?]" A detective with years of prior experience in the gang unit testified that the phrase is typically used as an aggressive statement by a Sureño confronting a rival gang member.

Perhaps most importantly, R.M. testified that when defendant made the statement, one of the victims "look[ed] back," which indicates the two victims were past defendant and were otherwise going to pass by without incident.

After defendant's statement, the victim(s) responded with, "[W]hat's up bitch[?]" and/or "Shut up ho." One pretended to punch defendant but did not. And one made a gesture toward his waist but did not retrieve a weapon. Defendant shot and killed them both. When he came in contact with a police officer later that day, defendant did not say what happened, which might be expected if defendant thought he was acting in self-defense.

The evidence supporting malice was substantially stronger than the evidence supporting self-defense. We acknowledge that there was some evidence the victims were eventually aggressive toward defendant, including their verbally aggressive responses, pretending to punch defendant, and making a threatening gesture toward the waist. But

---

[12] R.M. described it as defendant sitting back once he saw the two victims approaching.

this evidence was far weaker than the evidence of malice. Because while one of the victims pretended like he was going to punch defendant, he ultimately did not. And while one of the victims gestured toward his waist, he was never seen with a weapon.

Defendant posits that his preparation to shoot the victims as demonstrated by his shifting of position on the bench and moving his hand toward his waist where he had a gun, was "consistent with preparing to kill *should it be necessary to defend himself*." But that interpretation is substantially undermined by the evidence that the two victims were indeed planning to – and nearly did – walk by defendant without incident. Indeed, they made a nonaggressive, nonverbal greeting with their heads while walking by. Only after defendant said, "What's up ese[?]" did one of the victims "look[] back" and make a verbal response.

In sum, the evidence of malice was substantially stronger than the evidence of imperfect self-defense, such that we are confident that it is not reasonably probable the jury would have reached a different outcome if instructed on imperfect self-defense.[13]

## II.   The People Concede the Gang Enhancements Must be Reversed

Defendant raises two contentions with regard to the gang enhancements to each count. (§ 186.22, subd. (b).) First, he contends the gang enhancements must be reversed based on changes to the law made by Assembly Bill No. 333. Second, he contends insufficient evidence supports the gang enhancements under the version of section 186.22 in effect at trial, as clarified by our high court in *Renteria*, *supra*, 13 Cal.5th 951.

---

[13] The People also note that the jury necessarily found defendant "premeditated" the murder. Defendant insists that finding is not necessarily dispositive of the same issue presented by imperfect self-defense because defendant's "premeditation" may have been a "conditional" decision to kill the victims "should it be necessary" (italics omitted). Defendant effectively argues such a killing would be premeditated *and* an example of imperfect self-defense, which would constitute voluntary manslaughter. We need not determine whether the verdict as to premeditation and deliberation establishes harmlessness, as we find the evidentiary imbalance described above sufficient to establish harmlessness under *Watson*.

At the time of defendant's trial in 2021, section 186.22, subdivision (b)(1) required proof that: (1) the defendant committed a felony for the benefit of, at the direction of, or in association with a criminal street gang and, (2) he did so with the intent to promote, further, or assist in criminal conduct by gang members. In *Renteria*, our Supreme Court clarified the showing required to meet these standards when the defendant acts alone. (See *Renteria*, *supra*, 13 Cal.5th at pp. 963-964 [explaining that "cases involving lone actors pose different problems"].) Specifically, "[i]n a case involving a gang member who has acted alone in the commission of a felony, there must be evidence connecting testimony about any general reputational advantage that might accrue to the gang because of its members' crimes to the defendant's commission of a crime on a particular occasion for the benefit of the gang, and with the specific intent to promote criminal activities by the gang's members." (*Id*. at p. 969.)

The People concede the evidence was insufficient to show defendant had knowledge of the criminal activities of the members of his gang, and no evidence was presented to suggest defendant specifically intended to promote criminal activities by the gang's members. The People therefore concede the evidence is insufficient to prove defendant had the specific intent to promote criminal activities by the gang's members, as required by *Renteria*. (*Renteria*, *supra*, 13 Cal.5th at p. 969.) We accept the People's concession on this point and will reverse the gang enhancements and remand for resentencing.[14] Because *Renteria* requires reversal without permitting the People to retry the gang allegation, we need not, and therefore do not, address defendant's additional contention that the gang enhancements must be reversed under Assembly Bill No. 333's amendments to section 186.22, which would permit retrial.

---

[14] This moots defendant's contention that the court's imposition of a parole revocation restitution fine was improper. However, we note that if defendant's sentence after resentencing has no parole eligibility, no parole revocation restitution fine should be imposed.

## III.    Section 1109

Assembly Bill No. 333 also added section 1109, which requires bifurcation of the trial of gang enhancements from that of the underlying offenses upon a defendant's request.  (§ 1109, subds. (a), (b).)  Defendant contends section 1109 applies retroactively to him, and the court's failure to bifurcate entitles him to a new trial on the substantive offenses.  The People argue section 1109 does not apply retroactively and, in any event, any error in failing to bifurcate the gang-related allegations was harmless.  We conclude the failure to bifurcate the gang-related allegations was harmless and therefore do not address the parties' arguments regarding retroactivity.

### A.    Applicable Law

Courts of Appeal have split on the retroactive application of section 1109.  (See, e.g., *People v. Boukes* (2022) 83 Cal.App.5th 937, 948, review granted Dec. 14, 2022, S277103 [§ 1109 does not apply retroactively]; *People v. Ramirez* (2022) 79 Cal.App.5th 48, 65, review granted Aug. 17, 2022, S275341 [same]; *People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090 [same]; but see, e.g., *People v. Montano* (2022) 80 Cal.App.5th 82, 108 [§ 1109 applies retroactively]; *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1128–1130 [same]; *People v. Burgos* (2022) 77 Cal.App.5th 550, 564–569 (*Burgos*), review granted July 13, 2022, S274743 [same]; but see also *Burgos*, at p. 569 (dis. opn. of Elia, J.) [§ 1109 does not apply retroactively].)

In *People v. Tran* (2022) 13 Cal.5th 1169 (*Tran*), our Supreme Court declined to resolve this split of authority, concluding that "any asserted error in failing to bifurcate was harmless" on the facts of that case.[15]  (*Tran*, at p. 1208.)  The high court held that error in failing to bifurcate trial of gang-related allegations pursuant to section 1109 is subject to review under the harmlessness standard articulated in *Watson*, *supra*, 46 Cal.2d

---

[15] The issue of section 1109's retroactivity is again pending before our Supreme Court in *Burgos*, *supra*, 77 Cal.App.5th 550, review granted July 13, 2022, S274743.

818, absent a showing that the failure to bifurcate violated the defendant's federal constitutional right to due process. (*Tran*, at pp. 1208-1210.)

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439, italics omitted.) Thus, to prove a deprivation of federal due process rights, a defendant must satisfy a high constitutional standard. " 'Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process. Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citations.] Only under such circumstances can it be inferred that the jury must have used the evidence for an improper purpose.' [Citation.] 'The dispositive issue is . . . whether the trial court committed an error which rendered the trial "so 'arbitrary and fundamentally unfair' that it violated federal due process." ' " (*People v. Albarran* (2007) 149 Cal.App.4th 214, 229–230 (*Albarran*).) Where the admission of evidence violates due process by rendering the trial fundamentally unfair, we review the error under the harmless-beyond-a-reasonable-doubt standard articulated in *Chapman v. California* (1967) 386 U.S. 18, 24.

### B. Some Gang Evidence Remained Admissible

"[N]othing in Assembly Bill [No.] 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132.) It is well-settled that "[t]he People are generally entitled to introduce evidence of a defendant's gang affiliation and activity if it is relevant to the charged offense." (*People v. Chhoun* (2021) 11 Cal.5th 1, 31.) Relevant evidence on issues such as motive and identity can include "[e]vidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like." (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "[E]vidence of a defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal

disposition and is therefore guilty of the offense charged[.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) Nonetheless, where relevant, such evidence is admissible "if its probative value is not substantially outweighed by its prejudicial effect." (*Ibid.*; see *People v. Avitia* (2005) 127 Cal.App.4th 185, 192–193.)

Here, much of the gang evidence would have remained relevant and admissible, even if trial of the gang-related allegations had been bifurcated. (*People v. Carter*, *supra*, 30 Cal.4th at p. 1194 [evidence of gang membership is "admissible when relevant to prove identity or motive, if its probative value is not substantially outweighed by its prejudicial effect"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167 ["Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related."].) The People could permissibly present evidence regarding the VLS and VOCR gang subsets, as well as defendant's and victims' respective memberships in such gangs, to show that gang rivalry motivated the otherwise unprovoked shooting. Evidence of defendant's gang-related motive also was inferentially relevant on the issue of premeditation, and to identify defendant as the shooter. Identity, in particular, was clearly at issue in this case, making such evidence highly probative. The admissibility of this evidence to prove motive, identity, and/or premeditation, dispels any inference of prejudice arising from the failure to bifurcate. (See *People v. Hernandez*, *supra*, 33 Cal.4th at pp. 1049–1050.)

## C.     Any Inadmissible Evidence Did Not Violate Due Process

We acknowledge, however, that not all the gang evidence would have been admitted in a bifurcated trial of only the substantive offenses. For example, evidence regarding defendant's prior law enforcement contacts may have been excluded as cumulative or only minimally probative. Nonetheless, these contacts tended to show defendant's membership in the gang, a fact for which we have already explained the relevance. We therefore cannot say that there were no permissible inferences the jury

27.

could draw from such evidence, such that its admission violated defendant's right to due process. (See *Albarran*, *supra*, 149 Cal.App.4th at pp. 229–230.)

Additionally, evidence regarding predicate offenses committed by defendant's fellow VLS gang members had no relevance to the substantive offenses. The jury could draw no permissible inferences from this evidence. Nonetheless, this evidence was not " ' "of such quality as necessarily prevents a fair trial." ' " (*Albarran*, *supra*, 149 Cal.App.4th at p. 229.) The predicate offenses testified to at trial included burglary, assault with a firearm, unlawful possession of a firearm, assault with a deadly weapon other than a firearm or by means likely to produce great bodily injury on a peace officer in the performance of his or her duties, and driving with willful or wanton disregard for the safety of persons or property while fleeing from a pursuing peace officer. Only minimal detail was provided regarding each predicate offense. None of the offenses were committed by defendant. Evidence of the predicate offenses was not particularly inflammatory, especially when viewed in light of the charged offenses. The evidence was not of such a type or quantity to render the trial fundamentally unfair.

## D. *Albarran* is Distinguishable

In this regard, we reject defendant's attempt to analogize his case to *Albarran*, *supra*, 149 Cal.App.4th 214. In *Albarran*, two men shot at a house during a party, then fled on foot and jumped into a car occupied by three or four women. (*Id.* at pp. 217–218.) Three of the women identified Albarran as one of the men who jumped into the car. (*Id.* at p. 219.) Prior to trial, Albarran sought to exclude as irrelevant evidence of his gang affiliation and evidence the crimes were gang related. He also argued the evidence was inadmissible under Evidence Code section 352. (*Albarran*, at p. 219.) The prosecutor acknowledged he had "no percipient witness or evidence to prove the crime was gang related or motivated, but instead would be relying on testimony of the sheriff's gang expert, Deputy Gillis, who was most familiar with Albarran and his gang, the 13 Kings." (*Ibid.*) Following an Evidence Code section 402 hearing, the court determined a

28.

sufficient foundation had been laid for the expert testimony on the gang enhancements and gang evidence. The court also concluded the gang evidence was relevant to the issues of motive and intent as to the underlying charges, and the probative value of the evidence outweighed any prejudice. (*Albarran*, at p. 220.)

Gang evidence was introduced at trial and was frequently referenced by the prosecution. During his opening argument, the prosecutor referred to Albarran being a member of a " 'dangerous' " street gang, and described one of Albarran's tattoos as a " 'reference to the Mexican Mafia, which is a violent prison street gang that controls the Hispanic street gangs.' The prosecutor noted that when a person has such a tattoo it shows allegiance to the Mexican Mafia." (*Albarran*, *supra*, 149 Cal.App.4th at p. 220.) Three law enforcement officers, including the gang expert, testified Albarran was a member of the 13 Kings street gang. Additionally, the gang expert testified to the following:

> "Deputy Gillis testified he had 20 face-to-face contacts with Albarran in the prior two years. He described in detail Albarran's gang involvement, his tattoos and his gang moniker, 'Flaco.' He testified that the shooting occurred in the 13 Kings' gang area not far from Albarran's home. Deputy Gillis stated Albarran had been 'jumped into' the gang and that Albarran's brother had been recently jumped in as well. Deputy Gillis explained Albarran had a number of gang tattoos, including one referencing the Mexican Mafia. He also testified concerning the prevalence of 13 Kings graffiti around Albarran's home. Deputy Gillis described one piece of graffiti he attributed to Albarran's gang which contained a specific threat to murder police officers. He also identified a number of 13 Kings gang members by name and monikers and described arresting them. Gillis told the jury the 13 Kings committed a number of criminal offenses, including robberies, drive-by shootings, carjackings, and felony vandalism. Deputy Gillis explained how gang members gain respect by committing crimes and intimidating people. Deputy Gillis stated that during the commission of a crime a gang member makes himself known and can gain respect by showing or 'throwing' gang signs, yelling out an announcement of his presence or tagging. Gillis conceded that there was no evidence in this case that any of the shooters had made themselves known—the shooters made no announcements, did not throw any gang signs and there was no graffiti

29.

referring to the crime. Nonetheless, Gillis insisted that the shooters would gain respect within the gang absent such evidence because the people present at the party would know who was present at the party and would also know the shooters. Deputy Gillis testified that 'by word of mouth, word on the street,' it was known the Los Compadres gang was at the party.

"Deputy Gillis opined that the shooting . . . was gang related and intended to benefit the 13 Kings street gang because: (1) the shooting occurred in Palmdale; (2) it occurred at a party and gang members often commit crimes during parties; and (3) more than one shooter was involved. Deputy Gillis stated that when these crimes were committed the 13 Kings were involved in an active gang war. Deputy Gillis also testified [the owner of the home where the party occurred] was a member of another gang, the Pierce Boys Gang, but he admitted he was unfamiliar with the Pierce Boys Gang and knew of no rivalry between Albarran's gang and the Pierce Boys Gang." (*Albarran*, *supra*, 149 Cal.App.4th at pp. 220–221.)

The jury convicted Albarran on multiple counts and found gang enhancements to be true. Albarran filed a new trial motion, asserting insufficient evidence supported the gang allegations and, absent the gang allegations, the gang evidence was irrelevant and overly prejudicial with respect to the underlying charges. The trial court granted the new trial motion as to the gang enhancements and they were dismissed. However, the court denied the new trial motion as to the underlying charges. (*Albarran*, *supra*, 149 Cal.App.4th at p. 222.)

The Court of Appeal reversed, finding the gang evidence was improperly admitted, violating federal due process and rendering the trial fundamentally unfair. (*Albarran*, *supra*, 149 Cal.App.4th at p. 232.) The court concluded there was "insufficient evidence to support the contention that [the] shooting was done with the intent to gain respect [within the gang]." (*Id.* at p. 227.) Rather, the motive for the shooting "was not apparent from the circumstances of the crime." (*Ibid.*) Specifically, the gang associated with the house where the shooting occurred had no "known or relevant gang rivalries"; the shooters did not announce their presence or purpose before, during, or after the shooting; and no gang members had bragged about their involvement, created graffiti to that effect, or took credit for it. (*Ibid.*) Even the People's gang expert

30.

"conceded he did not know the reason for the shooting, though he had 'heard' that gang members were present at the party." (*Ibid*.) Ultimately, the only evidence supporting the "respect motive" proffered by the People was "the fact of Albarran's gang affiliation." (*Ibid*.)

The court also noted that the People admitted "extremely inflammatory gang evidence" with no connection to the crimes. (*Albarran*, *supra*, 149 Cal.App.4th at p. 227.) The gang expert testified "at length" about the identities of Albarran's fellow gang members, the crimes they had committed, and the "numerous contacts" between them and the police. (*Id.* at pp. 227–228.) The expert described "a specific threat" the gang had made in graffiti "to kill police officers." (*Id.* at p. 228.) The jury also heard references to the Mexican Mafia during the prosecutor's argument and the gang expert's testimony. "All of this evidence was irrelevant to the underlying charges and obviously prejudicial." (*Ibid*.) The court surmised this evidence "approached being classified as overkill." (*Ibid*.)

Moreover, no permissible inferences could be drawn from this evidence and there was "a real danger that the jury would improperly infer that whether or not Albarran was involved in these shootings, he had committed other crimes, would commit crimes in the future, and posed a danger to the police and society in general and thus he should be punished." (*Albarran*, *supra*, 149 Cal.App.4th at p. 230.) The inflammatory nature of the evidence "could only have served to cloud [the jury's] resolution of the issues." (*Ibid*.) Accordingly, the court determined the gang evidence was " ' "of such quality as necessarily prevents a fair trial." ' " (*Id.* at pp. 230–231.) Furthermore, "[g]iven the nature and amount of this gang evidence at issue, the number of witnesses who testified to Albarran's gang affiliations and the role the gang evidence played in the prosecutor's argument," the court could not conclude "beyond a reasonable doubt that the error did not contribute to the verdict." (*Id.* at p. 232.)

31.

The outcome in *Albarran* was compelled, in part, by a complete absence of evidence that the crimes were gang related or, more importantly, that Albarran had any gang-related motivation. (*Albarran*, *supra*, 149 Cal.App.4th at pp. 217, 222, 227.) The instant case is distinguishable on this basis. Here, clear evidence supported a gang-related motivation for the shootings. Defendant initiated contact with the two victims by saying, "What's up ese[?]" Diaz testified that the phrase "what's up ese" (boldface omitted) is an aggressive statement used when a Sureño gang member confronts a rival gang member, whether Norteño or Bulldog. The victims' immediate response to the statement corroborates Diaz's view that the phrase constituted an aggressive, gang-related salvo. The exchange between defendant and the victims provided a sufficient basis to permit the People to introduce evidence of motive based on gang rivalry.

Moreover, the gang-related evidence presented in the instant case was less inflammatory than that presented in *Albarran*. The evidence regarding defendant's prior, gang-related law enforcement contacts included reference to a citation for his violation of a gang injunction, and the suggestion that he was an occupant of a vehicle, some or all of whose occupants had engaged in an argument or fight with a rival gang member. The encounters otherwise did not refer to criminal activity on defendant's part. Additionally, unlike the predicate offenses in *Albarran*, which were testified to "at length" (*Albarran*, *supra*, 149 Cal.App.4th at pp. 227–228), the predicate offenses testified to in defendant's trial were described in only minimal detail.

Defendant makes much of the number of gang witnesses and the time their testimony consumed. In *Albarran*, the prosecutor relied primarily on the testimony of its gang expert, which "consumed the better part of an entire trial day (in a six-day trial) and span[ned] 70 pages of the reporter's transcript."[16] (*Albarran*, *supra*, 149 Cal.App.4th at

---

[16] At the time of Albarran's trial, a gang expert could permissibly testify regarding case-specific facts of which he had no firsthand knowledge, under the guise such testimony was not offered for its truth. (*People v. Sanchez* (2016) 63 Cal.4th 665, 680-

p. 227, fn. 10.)  Here, eight witnesses, other than the expert witness, presented gang-related testimony over the course of two days.  Many other percipient witnesses were interspersed with these witnesses.  The testimony of these witnesses concerned the predicate offenses and petitioner's law enforcement contacts, and spanned approximately 49 pages of the reporter's transcript.  Each witness testified for approximately five to 15 minutes.  A portion of that testimony covered the biographical details of each witness.  The gang expert testified for approximately two and one half hours.  The length and volume of this testimony, whether standing alone or viewed in the context of the entire trial, does not suggest defendant's trial was fundamentally unfair.

Finally, we acknowledge defendant's point that the gang expert in his case, like the gang expert in *Albarran*, mentioned the Mexican Mafia.  He did so in three instances: (1) in explaining that the Sureño gang falls under the umbrella of the Mexican Mafia and Sureños may be required to pay money to the Mexican Mafia for protection of incarcerated Sureños; (2) to explain that tattoos of the letter "M" or the number 13 (which references the 13th letter of the alphabet, M), show an alliance with the Mexican Mafia; and (3) to opine that defendant's Marilyn Monroe tattoo was a reference to the initials of the Mexican Mafia, MM.  No other information was presented regarding the Mexican Mafia or its activities.  The expert did not characterize the Mexican Mafia as a " 'violent prison street gang that controls the Hispanic street gangs' " (*Albarran*, *supra*, 149 Cal.App.4th at p. 220), or provide any other context that would make reference to the Mexican Mafia any more prejudicial than reference to VLS or the Sureño criminal street gang.  These brief references to the Mexican Mafia did not render defendant's trial fundamentally unfair.

684.)  Doing so is no longer permissible.  Rather, such evidence must be introduced through appropriate witnesses.  (*Id.* at p. 684.)  It therefore is not clear that *Albarran* continues to provide a meaningful benchmark regarding the volume of gang-related witnesses or testimony that may be considered "overkill."  (See *Albarran*, *supra*, 149 Cal.App.4th at p. 228.)

### E. Failure to Bifurcate was Harmless

Because failure to bifurcate did not render the trial fundamentally unfair, we review for prejudice under the *Watson* standard. (*Tran*, *supra*, 13 Cal.5th at p. 1209.) We conclude there is " 'no reasonable probability the error of which the defendant complains affected the result.' " (*Beltran*, *supra*, 56 Cal.4th at p. 956.)

First, the evidence of defendant's guilt was overwhelming. G.V. and R.M. both identified defendant at trial as the shooter, although G.V.'s in-court identification was less certain. R.M. also readily identified defendant in a photographic lineup, and provided law enforcement with key identifying information regarding defendant's zip code tattoo. G.V. likewise was able to provide identifying information regarding defendant's tattoos, in particular a "V" and another large, linear letter on his legs. In addition, both G.V. and R.M. reported to law enforcement that the shooter identified the woman who passed by the bench on a bicycle with a trailer prior to the shooting as his sister. A card bearing defendant's sister's name was found in the trailer of a bike found within the crime scene area.

In contrast, as we have explained, the inadmissible gang-related evidence was not highly inflammatory. Descriptions of defendant's law enforcement contacts, the predicate offenses, and the Mexican Mafia were brief. Given the admissibility of the most significant gang evidence on the issues of motive and identity, it is not reasonably probable that a result more favorable to defendant would have been reached had the gang-related allegations been bifurcated. (*Watson*, *supra*, 46 Cal.2d at p. 837.) In sum, any error in failing to bifurcate the gang-related allegations was harmless.

## **DISPOSITION**

Defendant's two gang enhancements are reversed and the matter is remanded for resentencing.  In all other respects, the judgment is affirmed.


DETJEN, J.

I CONCUR:


LEVY, Acting P. J.

POOCHIGIAN, J., Concurring.

I concur in the judgment, and the court's reasoning concerning the reversal of the gang enhancements and the failure to instruct on imperfect self-defense.  However, I would resolve defendant's claim regarding Penal Code section 1109[1] on the merits rather than on the basis of harmlessness.[2]

## IV.  Section 1109 is Not Retroactive

"Assembly Bill No. 333 [] enacted section 1109.  Section 1109, which took effect on January 1, 2022, requires trial courts to bifurcate the trial on a gang enhancement if the defendant so requests.  (§ 1109, subd. (a); Stats. 2021, ch. 699, § 5.)  A bifurcated trial on a gang enhancement will occur only if the defendant is first found guilty of the underlying offense.  (§ 1109, subd. (a)(1) & (a)(2).)"  (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 64–65, review granted Oct. 12, 2022, S275341.)

"Assembly Bill No. 333 did not expressly address whether any of its provisions were intended to apply retroactively or only prospectively."  (*People v. Ramirez*, *supra*, 79 Cal.App.5th at p. 65.)

Defendant contends that the judgment should be reversed because section 1109 is retroactive and "entitles a defendant, upon request, to have the gang allegation

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

[2] The majority observes that some of the gang evidence would have been admissible to prove motive even at a bifurcated trial on the nongang offenses.  But that would primarily extend only to evidence that defendant and the victims belonged to rival groups and that killing rivals is something gang members do.  The evidence that defendant belonged to a group whose members have, in the past, committed a whole host of serious crimes would presumably *not* be admissible to prove motive.  As the majority acknowledges, the jury here learned that defendant's compatriots committed burglary, assault with a firearm, unlawful possession of a firearm, assault with a deadly weapon other than a firearm or by means likely to produce great bodily injury on a peace officer in the performance of his or her duties and driving with willful or wanton disregard for the safety of persons or property while fleeing from a pursuing peace officer.  The issue of whether such evidence was prejudicial is much closer than the issue of whether there was error under section 1109.

adjudicated separately after a trial to determine his guilt." However, section 1109 is not retroactive and therefore inapplicable to defendant's case.

*Analysis*

No part of the Penal Code is retroactive unless it says so "expressly." (§ 3.) Section 1109 is part of the Penal Code and does not expressly state that it is retroactive. As a result, section 1109 is not retroactive.

Defendant resists this straightforward conclusion, relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*.) However, the Supreme Court has since acknowledged that *Estrada* "[s]harply depart[ed] from the language of section 3." (*People v. Brown* (2012) 54 Cal.4th 314, 324 (*Brown*).) Accordingly, our high court has "declined to follow *Estrada*'s remarks about section 3." (*Ibid*.) Whatever else may be said of it, *Estrada* did not modify the well-established default of prospective application mandated by the Legislature. (*Brown*, at p. 324.)

Instead, *Estrada* is "properly understood, not as weakening or modifying the default rule of prospective operation codified in section 3, but rather as informing the rule's application in [the] specific context" of mitigating punishment for a particular criminal offense. (*Brown*, *supra*, 54 Cal.4th at p. 324.) In other contexts, the Supreme Court has taken a case-by-case approach. For example, the Supreme Court has given retroactive effect to statutes involving pretrial diversion programs, Proposition 57, and amendments to section 186.22, while declining to give retroactive effect to Proposition 51 and statutory changes to the accrual rate of conduct credits. (See *People v. Tran* (2022) 13 Cal.5th 1169, 1238; *People v. Frahs* (2020) 9 Cal.5th 618; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299; *Brown*, *supra*, 54 Cal.4th at pp. 324–326; *Evangelatos v. Superior Court* (1988) 44 Cal.3d 1188, 1208–1209.) To date, the Supreme Court has declined to determine whether the statute at issue here, section 1109, is retroactive. (*People v. Tran*, at p. 1239.)

2.

In the specific contexts where the Supreme Court has required it, courts are bound to follow *Estrada*'s departure from section 3. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455). But we should not expand it. (See *Brown*, *supra*, 54 Cal.4th at p. 324 [*Estrada* properly plays a "limited role" in jurisprudence of prospective versus retrospective application].) In fact, we are *precluded* from expanding it, because while we must follow Supreme Court precedents where they apply, we are bound by section 3 in all other circumstances. (See Code Civ. Proc., § 1858.)

Even if it were permissible to consider extending *Estrada*, we should not expand it. *Estrada* stands for the proposition that, in the absence of contrary indication of legislative intent, legislation that "ameliorates punishment" applies to all nonfinal cases. (*People v. Esquivel* (2021) 11 Cal.5th 671, 675.)

*Estrada* reasoned,

> "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Estrada*, *supra*, 63 Cal.2d at p. 745.)

Regardless of whether this rationale can be reconciled with section 3 as a general matter,[3] it does not apply to section 1109. Section 1109 does not mitigate or ameliorate punishment. (*People v. Ramirez*, *supra*, 79 Cal.App.5th at p. 65.) Rather, it is "a procedural statute" concerning bifurcation of proceedings intended to avoid prejudice occasioned "by the introduction of evidence to support gang enhancement allegations."

---

[3] I do not deny the temptation to reason that if the Legislature thinks a particular change is good for future cases, it must think those changes would also be good for past cases. In other words, that we should presume retroactivity. But that is the diametrical opposite of what is required by the abundantly clear language of section 3.

(*People v. Perez* (2022) 78 Cal.App.5th 192, 207, review granted Aug. 17, 2022, S275090.)

Some cases have held section 1109 does "ameliorate punishment" because the new procedural changes might avoid wrongful *convictions* which would ultimately eliminate punishment for those particular defendants.  (See *People v. Montano* (2022) 80 Cal.App.5th 82, 106–107; *People v. Burgos* (2022) 77 Cal.App.5th 550, 567, review granted July 13, 2022, S274743; see also *People v. Ramos* (2022) 77 Cal.App.5th 1116, 1129.)  These cases elide the distinction between statutes intended to ameliorate punishment versus those that are intended to promote fair proceedings.

This distinction is material because *Estrada*'s rationale that the Legislature would presumably desire retroactive application of intentionally ameliorative statutes does not necessarily apply to statutes with other interim or ultimate goals.  *Estrada* cannot be taken to mean that presumptive retroactivity applies regardless of how *indirectly* a new statute *might* ultimately result in a lesser punishment in *some* unknown number of cases.  Such an exception to section 3 would swallow the rule.  Instead, the standard approach should apply to nonameliorative statutes, such that they apply prospectively unless the Legislature expressly says it applies retroactively.[4]

We need not resort to harmlessness because defendant's claim of error lacks merit.  For these reasons, I concur in the judgment only.

POOCHIGIAN, J.

---

[4] Given the volume of cases that analyze and struggle with the issue of retroactivity and the unambiguous meaning of section 3 – about which the Legislature is presumably well aware – the most sensible rule of statutory construction is that unless the legislation specifies it is retroactive, the *Estrada* exception for ameliorative sentencing does not apply and section 3 requires prospective application.